PETER T. COFFIELD & SON v. SPEARS & RIDDLE et al.

(Circuit Court, N. D. West Virginia.   April 16, 1909.)

No. 136.

1. PATENTS (§ 237*)—INFRINGEMENT—SUBSTITUTION OF EQUIVALENTS.

The replacing of a coil spring in patented machine by a flat or leaf spring which performs the same function in substantially the same way is merely the substitution of a mechanical equivalent, and does not avoid infringement.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 374; Dec. Dig. § 237.*]

2. PATENTS (§ 112*)—EFFECT OF DECISIONS OF PATENT OFFICE—PROCEDURE.

Irregularities in the Patent Office in relation to the issuance of an original or reissued patent must not only be pleaded but established affirmatively by full and satisfactory proof to defeat the patent or reissue.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 162; Dec. Dig. § 112.*]

3. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—WATER MOTOR.

The Coffield reissue patent No. 12,719 (original No. 806,779), for a water motor, was not anticipated, and discloses invention, and is not invalidated by any irregularity in the granting of either the original patent or the reissue.   Also *held* infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity.   On final hearing.

This suit is based upon alleged infringement of reissued letters patent to Peter T. Coffield, No. 12,719, applied for July 28, 1906, granted November 12, 1907, the original patent, No. 806,779, having issued to Coffield December 12, 1905.   The assignments of both the reissued and original patents by Coffield to the complainants are not controverted.   The defenses to the suit are, substantially, (1) lack of infringement and (2) invalidity of the reissue, in that (a) the application for the original patent was unlawfully amended by the introduction of new matter not sworn to by the inventor; (b) no inadvertence, accident, or mistake has been shown such as would warrant the grant of the reissue; (c) the reissue is an expansion of the original patent not warranted by law; (d) the reissue is invalid in so far as it may be held to include the intervening rights acquired by defendants in the manufacture of their motors; and (e) that no invention is shown in the alleged improvements set forth in complainants' patent, wherefore it is void.   The object of the invention as set forth in the specifications are:

"To provide a water motor for driving light machinery, such, for example, as washing machines or other machines having a reversed motion.

"A further object of the invention is to provide a water motor of the above type, which is positive and reliable in its operations, and in which means are provided for preventing stoppage of the motor at any point of its stroke while under power; a motor which will continue in its operation without attention."

---

Referring to an enlarged drawing reproduced from the patent one, filed by complainants, and now attached hereto, the parts and their functions of this motor are fully described as follows:

A cylinder, A, the ends of which are inclosed by two heads, B, B.

A piston, F, movable in opposite directions within the cylinder by the pressure of water which alternately enters the cylinder on each side of the piston. The piston is divided into two chambers, G and G', made noncommunicating by the intervening wall, H. Chamber, G', is the inlet chamber, and receives the water from the faucet through a pipe or hollow piston rod, E. Chamber, G, is the exhaust chamber, into which the water passes from the cylinder after exerting its pressure to drive the piston in one or the other of its movements. The exhaust or spent water passes from this chamber, G, out of the motor through a pipe or hollow piston rod, E'. The inlet pipe or hollow piston rod, E, is connected with the faucet at the kicthen sink by means of a piece of hose, in order that the piston, F, and the pipes or hollow piston rods, E, E', may be free to move back and forth as the piston moves back and forth. The hollow piston rods or pipes, E, E', pass through stuffing-boxes, D, D, in the cylinder heads, B, B, and the hollow piston rod, E', which carries away the spent water, is connected to a rack or cog bar, which in turn connects with a cogwheel on the dasher or agitator of the washing machine and imparts oscillating movement to said dasher or agitator. In Fig. 1 of the drawings of the patent, a portion of the cog bar referred to is shown. The spent water conveyed from the motor through the hollow piston rod, E', is conveyed to the sink or elsewhere by means of a rubber hose, or in any suitable manner.

Within the inlet chamber, G', of the piston is located double puppet inlet valves, I, which seat alternately in the interior sides of the piston when the motor is in operation. These valves control the flow of water from the piston chamber, G', alternately to one or the other side of the piston. The said valves are connected and have extensions, K', extending on each side of the piston, and upon these extensions, K', are located coil springs, K. As the piston approaches one or the other end of the cylinder, one or the other of the springs, K, first engages one or the other of the cylinder heads, B, and the continued movement of the piston compresses said spring until the valve extension, K', engages a cylinder head, B, and unseats or initially moves the valve from its seat in the piston. At this moment the valve would remain in a balanced position owing to the equal water pressures on each side thereof, and the piston would remain still at an end of the cylinder. The compression of the spring, K, has the effect, however, of imparting, instantaneously, a further or final movement to said valve to shift the same to the opposite seat. The result is, one seat is opened on one side of the valve, and the other seat is closed, to compel the water from the piston chamber, G', to pass out on one side of the piston at a time and to thus supply the cylinder alternately on one side or the other of the piston with the necessary water to drive the piston back and forth in the cylinder. The discharge of the water from the cylinder on one or the other side of the piston after said water has had the effect of moving the piston to one or the other end of the cylinder is controlled by double puppet exhaust valves, J, which are mounted in the exhaust chamber, G, of the piston, and seat alternately in seats in the outer sides of the piston. These exhaust valves, J, it will be observed, are connected to a common stem just as are the inlet valves, I, but they are spaced further apart, in order that they may seat on the outer sides of the piston, while the inlet valves, I, seat on the inner sides of the piston, as before stated. The said exhaust valves, J, have extensions, K', at each end, upon which are mounted coil springs, K. As the piston reaches one or the other end of the cylinder, the spring, K, on one or the other end of the valves, J, engages a cylinder head, B, and is compressed by the continued movement of the piston until the extension, K', engages the cylinder head and opens the valves. At this moment the water pressures on both sides of said valve, J, would balance said valve and cause the piston to stop, just as in the case of the inlet valves, I, but the compressed spring, K, instantly throws said exhaust valve, J, to one or the other of its seats, and thus seats one of said valves on one side of the piston and unseats the other on the other side, thus admitting water to the

piston chamber, G', from one end of the cylinder, thus preventing said water from entering said chamber on the other side of the piston or other end of the cylinder.

The functions of the springs, K', are the same in the case of both valves; they immediately complete the movement of the valves after said valves have been given their unseating or initial movement. The valves move in opposite directions; for example, when the inlet valves, I, move in one or the other direction by the piston arriving at one or the other end of the cylinder, the movement imparted to it by the extension, K', and the spring, K, is in an opposite direction from that imparted to the exhaust valve, J, its extension, K', and spring, K, engaging the cylinder head substantially at the same time the extension, K', and spring, K, of the inlet valve engages said cylinder head. The result is, the inlet valves, I, establish a communication between the inlet chamber, G', in the piston and the cylinder on one side of the piston, while the exhaust valves, J, establish a communication between the exhaust chamber, G, in the piston and the cylinder on the other side of the piston, and thus water flows to the cylinder on one side of the piston and discharges from the cylinder on the other side of the piston, and thus a continued reciprocating movement is imparted to the piston as long as the water is turned on at the faucet, and this movement is imparted to the washing machine.

Looking at Fig. 1 of the patent drawing, the piston is moving to the right under the pressure of water admitted from the chamber, G', through the left-hand valve, I, to the left side of the piston, and the water which was previously admitted to the right side of the piston to drive the piston in the opposite direction is passing into the exhaust chamber, G, through the right-hand exhaust valve, J, which is shown to be unseated.

Upon the arrival of the piston at the end of the cylinder, as shown in this large drawing of complainants' motor, the position of the valves is about to be reversed; the inlet valve, I, being still open on the left-hand side of the piston, and the exhaust valve, J, being still open on the right-hand side of the piston. In the enlarged drawing of complainants' motor, the piston is shown in a position where the springs, K, K, have been compressed to a sufficient extent to permit the valve extension, K', K', to engage the cylinder head, B, at that end of the motor. The inlet valve, I, is just about to be unseated on the right side of the piston, and the inlet valve, I, is about to be seated on the left-hand side of the piston, or reversed from the position shown in said drawing by the combined action of the valve extension, K', engaging the cylinder head and the effect of the compressed springs, K; the exhaust valve, J, is about to be seated on the right-hand side of the piston and opened on the left-hand side, or reversed from the position shown in said drawing by the combined action of the valve extension, K', engaging the cylinder head, and the effect of the compressed spring, K. When the reversal of these valves occurs, which is instantaneous upon the arrival of the piston at one or the other end of the cylinder, the return stroke of the piston takes place, and there is thus kept up a continuous reciprocation of the piston during the period of its operation.

It will be seen that the motor is in fact "a reciprocating water motor whose piston travels back and forth in the cylinder without crank and fly wheel to accomplish such operation. The travel of the piston itself carries the valves to a position where they are mechanically unseated, and at that moment springs which have a special function come into action, and instantly complete the movement of the valve, thus permitting the reciprocating action of the piston to continue."

The two claims of the reissued patent involved in this controversy are:

"(1) In a water motor, a cylinder, a piston divided into two communicating chambers, hollow rods communicating with said chambers, double puppet inlet valves and double puppet exhaust valves mounted in said piston, in combination with springs adapted to impart to said valves their final movements after being unseated, thereby reversing the travel of the piston.

"(2) In a water motor, a cylinder having inclosing heads, a piston divided into two noncommunicating chambers, hollow piston rods communicating with said chambers, balance exhaust valves lying on the outside of one of said chambers and seating against the outer side of the piston, said exhaust

valves being connected to a common stem and having extensions beyond the valves, balance inlet valves located within the other chamber, said inlet valves having stems projected on each side beyond the piston, coil of springs carried on the stems of said exhaust and inlet valves and adapted to impart the final movement to the valves after said valves have been given their initial movement by the contact of their stems with the cylinder heads, substantially as set forth."

Under contract, in January, 1906, the personal defendants under the firm name of Spears & Riddle became the selling agents in specified territory of complainants' motors. This contractual relation existed for some months, when defendants terminated it and engaged in the manufacture of water motors independently. The motors so manufactured are described in two patents secured by the defendant Ralph R. Spears, under dates of April 2, 1907, and June 11, 1907, numbered 849,279 and 856,992, respectively.

Richard J. McCarty, for complainants.
Frank C. Cox and E. G. Siggers, for defendants.

DAYTON, District Judge (after stating the facts as above). Unusual as the statement may be in cases of this character, it does not seem to me that this controversy involves any great degree of difficulty in its determination. So far as the question of infringement is concerned, it is very clear that the motors manufactured by defendants are identical with those manufactured by complainants under their reissued patent, except that defendants have substituted flat or leaf springs attached to the cylinder heads for the coil ones carried on the stems of the exhaust and inlet valves in complainants' motors. The thing to be accomplished in both is precisely the same—to impart the final movement to the valves after said valves have been given their initial movement by contact with the cylinder heads. Simply expressed, this is done in the one case by a spring attached to the valve striking the plain cylinder head, in the other case by the plain valve striking the spring attached to the same cylinder head; the only difference being in the form and location of the spring. It is impossible for me to see what advantage can be derived by either the changed form or location of the spring adopted by the defendants under the conditions existing. It is a clear case of substitution of a mechanical equivalent designed to perform the same function, and in substantially the same way. "The substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work, in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape." Union Paper Bag M. Co. v. Murphy, 97 U. S. 126, 24 L. Ed. 935; Morley S. M. Co. v. Lancaster, 129 U. S. 263, 9 Sup. Ct. 299, 32 L. Ed. 715. I, therefore, have no trouble in determining that the motors constructed by defendants under the Spears patents are clear infringements of complainants' reissued patent as to both claims of the latter.

Nor, after examination of the prior art patents, do I have trouble in reaching the same conclusion arrived at by the Board of Appeals in the Patent Office, that Coffield, the patentee, was the first to use, in connection with the elements of the mechanism, springs which complete the stroke of the valve, and that, taken as a whole, the device

is new, useful, and patentable. This Board of Appeals has twice considered this invention, first upon the original patent, and lastly upon the reissued one. Upon the latter consideration it has clearly and concisely considered the prior art patents relied upon and pointed out in its report, made part of the record, and the distinguishing features of complainants' device. It would be useless for me to attempt to add to what is there so well and clearly said touching this matter.

As to the technical defenses touching alleged irregularities in the Patent Office in the issuing of the original and reissue patents without proper affidavits and evidence of inadvertence, accident, or mistake, it is to be remembered that no such irregularities will be assumed to have occurred, but, on the contrary, the granting of the patent is prima facie evidence that the law has been complied with, and fatal irregularities in the Patent Office must not only be aptly pleaded but shown by full and satisfactory proof. In case the original patent has been surrendered and a reissued one has been granted, it has been held that such office proceedings can only be impeached for fraud. Stimpson v. Railroad Co., 4 How. 380, 11 L. Ed. 1020; Battin v. Taggart, 17 How. 77, 15 L. Ed. 37; Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33. In this case the allegations of the answer are not sufficient to put in issue any such defense. The third paragraph thereof substantially denies, instead of charging, such irregularities in the issue of the original patent as are now relied upon in argument, and the mere expression of opinion by an expert witness, based solely upon an examination of the file wrapper, that such irregularities may have existed, is wholly insufficient evidence to support any such charge.

Finally, the main contention of the defendants that the reissued patent to Coffield was an unwarranted expansion of the original one, and therefore invalid so far as it affected the intervening rights of defendants, is not, in my judgment, tenable, because, as I have heretofore indicated, I regard the substitution of the flat or leaf springs attached to the cylinder heads adopted by the defendants to be nothing more than a mechanical equivalent for complainants' coil springs carried on the stems of the exhaust and inlet valves, and therefore no legal "intervening rights" of defendants have been affected by this reissue. But if I am wrong in this conclusion, and if the reissue does broaden the original by any additional claim, I am very clear that the conditions here are such as not only to warrant but even require me to uphold such reissue, under the well-settled rules laid down in such cases as Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658, Fay v. Mason (C. C.) 120 Fed. 506, and United Blue-Flame Oil Stove Co. v. Glazier, 119 Fed. 157, 55 C. C. A. 553. There can be no laches charged against the plaintiffs in making the application. The original patent bears date December 12, 1905, and the application for reissue was made less than eight months thereafter on July 28, 1906, before defendants had manufactured a single motor, and when the contract of agency existing between complainants and defendants was still existing, it having been terminated by notice as of August 1, 1906. It therefore would seem that defendants are in no

way affected in their intervening rights by this reissue, simply because they had none to be affected.

Let the injunction issue and an accounting be directed.