## MEAD-MORRISON MFG. CO. v. EXETER MACH. WORKS.

### (Circuit Court of Appeals, Third Circuit.   July 8, 1915.)

### No. 1911.

1. PATENTS ⬦328—VALIDITY AND INFRINGEMENT—HOISTING APPARATUS FOR COAL TOWERS.

The Norris patent, No. 722,613, for a hoisting apparatus for coal towers, in which, for the two separate geared engines of the prior art, are substituted direct acting engines mounted on one base, with the result of economizing space in the tower, increasing the number of buckets of coal hoisted in a minute from 3 to 5, while the engines are run at lower speed, and also neutralizing and so lessening the vibration which in the use of the geared engines was so extreme as to. injure the tower, cause frequent breakdowns, and tire the operatives, discloses patentable invention, and covers a true combination of marked efficiency in which the engines co-operate to accomplish a new and much improved result.

2. PATENTS ⬦328—INFRINGEMENT—VALIDITY.

Norris patent, No. 722,613, for hoisting apparatus for coal towers, *held* valid and infringed.

3. PATENTS ⬦35—VALIDITY—HOISTING APPARATUS.

The contribution to an important industry of a device which lessens the strain and tension in a trying field of labor enhances its value and tends to show its highly useful operative character.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 39;  Dec. Dig. ⬦35.]

4. PATENTS ⬦101—ADVANTAGES NOT DISCLOSED IN SPECIFICATION.

Where the disclosure in a patent is sufficient to enable those versed in the art thereafter to use the patented device, the requirements of the law are fully satisfied, without claiming every advantage such device may have. Very often subsequent use shows that claimed advantages did not materialize, or brings to light unsuspected merits, and the fact that there is no mention in a patent of what later appears to be the most striking advantage should not serve to defeat it.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 141;  Dec. Dig. ⬦101.]

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Chas. B. Witmer, Judge.

Suit in equity by the Mead-Morrison Manufacturing Company against the Exeter Machine Works.   Decree for defendant, and complainant appeals.   Reversed.

For opinion below, see 215 Fed. 731.

Emery, Booth, Janney & Varney, of Boston, Mass. (Thomas B. Booth, of Boston, Mass., of counsel), for appellant.

E. G. Siggers, of Washington, D. C., and A. L. Williams, of Wilkes-Barre, Pa., for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge.   This case centers on the presence or absence of invention in patent No. 722,613, granted March 10, 1903, to Almon E. Norris for hoisting apparatus.   The novelty and utility of the device are clear.   The court below, in an opinion reported at 215 Fed. 731, held the patent was invalid for lack of invention.   From a decree so adjudging and dismissing the bill the owner of the patent appealed.

[1, 2] Taking the hoisting art, in which Norris' device has been widely used, as conveniently illustrative, we may say the proofs show that

prior to Norris' patent, motive power for hoisting coal in buckets from the hold of a vessel consisted of two engines, which were placed near each other on a platform located in a tower. Each of these engines was geared to the shaft of a hoisting drum. To this tower was attached one end of a boom, which could swing both vertically and horizontally. Mounted on the boom was a carrier or trolley, from which was suspended a coal-carrying bucket. The larger of these two engines, called the hoisting engine, controlled the movement of the bucket up and down, the other in and out. As the engines were geared to drums on which the hoisting ropes wound, they had to be run at high speed to enable the buckets to make the three trips a minute which was required to unload a cargo of coal with due dispatch. Such speed, coupled with the fact that the engines were restricted in size and weight by the smallness of the tower house floor, resulted in great and objectionable vibration of the tower, the character of which will be noted hereafter. The device of the plaintiff almost entirely eliminated this vibration, reduced the wear and tear of the engines, and increased the speed of unloading to the extent of five buckets a minute instead of three. This was accomplished by the simple expedient of nesting a trolley engine between the two cylinders of a hoisting engine and making the two engines a unitary structure. Mechanically this gave to each engine the combined weight and solidity of both, and made each of much larger power and weight than was possible before. Through this gain in weight direct instead of geared engines could be used and run at a lower speed, space was saved, wear and tear were lessened, and, what seems at first thought wholly impossible, the vibration caused by one engine was largely neutralized by that of the other engine. These several features are conclusively shown by the proofs. Thus the president of the City Fuel Company of Boston, which used both the prior and the patented types of engine, testified:

"To the direct engine there is scarcely any vibration. To the indirect, the vibration is very excessive. The vibration to the direct engine is scarcely noticeable, whereas we frequently have complaints from our men as to the excessive vibration from the geared engines, and have often heard the remark applied to a geared engine, 'This tower will shake your teeth out.' I have spent a great deal of time myself in our different towers, and am very familiar with the question of vibration, which I find so great in the towers with geared engines that I do not go into them any more without it being of extreme necessity; whereas I find a great deal of pleasure in going into our tower at East Boston, which has a direct engine, as it works so smoothly and with scarcely no vibration to the tower itself. * * *"

He further testified that with a direct acting engine five bucket trips a minute were made as against three with a geared engine, and that with larger buckets; that owing to the excessive vibration men only work a third as long with a geared as they do with a direct; that one tower equipped with direct engines handles practically three times as much coal as two towers equipped with geared engines. He testifies that this quick dispatch has enabled them to secure larger vessels and reduce their freight from 5 to 10 cents a ton. One of the foreman engineers of the New England Coal & Coke Company testified substantially to the same marked difference in hoisting capacity of the direct engine, and added:

"The vibration of the geared engine was tremendous. Well, to run a geared engine for 10 hours the vibration and shake would almost completely tire a man out at the end of that time; and, as regards trouble caused by the vibration, there were a great many breakdowns. The direct connected engines could be operated for 10 hours without tiring a man."

He testified these breakdowns occurred during discharges; that they were kept about all the time tightening the foundation bolts to keep the engine to the floor; that the steam pipes were broken; the different parts of the engine shaken apart while it was running, and the vibration broke parts of the tower. He said there were no breakdowns from vibration on direct engines, and as a reason said:

"I believe it to be on account of the slower speed the engine travels at, and both engines being mounted in the center of the tower, one on top of the other, and also the absence of gears."

An experienced designer and erector of coal-hoisting plants testified that it was difficult to hold geared engines on their beds, that all sorts of methods were tried, but they could not hold them; that this caused breakdowns. He says:

"They can do a great deal more work with the direct-connected type—I should say about 30 per cent. more with the direct-connected type, on continuous running. As a matter of fact, it is hard to run for any length of time with the geared engines without breakdowns, but with the direct connected type we have no trouble that way. As a matter of fact, the men do run them on long stretches. They work night and day with the direct-connected type, and they were unable to do it with the geared type. For instance, take the plant down in Beverley; they start on a boat when she comes in, and they never stop until the boat is discharged, and that usually takes from 18 to 20 hours on the type of coal that they handle. These direct-acting engines were put in for that purpose, as they had the geared type previously to building their new plant, and the men could not stand to work night and day."

He further testified to an effort being made to increase the size of geared engines, but the vibration and repairs were such they were taken out. Referring to the lesser vibration on direct connected engines he testified:

"Of course the direct connected engine is run very much slower than the geared. That is one reason. Another reason, I think, is that because one engine is mounted upon the other—they are part of each other. For instance, if the large engine started and any vibration or sway started, the minute the trolley engine starts up this is all broken up and stops almost instantly."

He adds his opinion that if the trolley engine was mounted on a separate frame from the hoisting engine and had its individual fastenings to the floor of the tower, this would not accomplish the same purpose as when the two engines were mounted on the same base. The testimony of the superintendent of the Suffolk Coal Company of Boston is:

"Q. How severe was the vibration caused by the separately mounted geared engines? A. The vibration caused from the separately mounted general engines was so great that it was practically impossible to keep the engines fastened to the floor as well as the levers and the connections. The tools and other articles about the tower had to be fastened or hung up, or they would travel all about the tower. The operators of the engines were constantly complaining of lame arms, shoulders, backs, and necks. In some cases men refused to operate the engines until a barge was discharged. Q. What expedients did you employ in trying to keep the engines fastened to the floor? A. I added heavy timbers to the framework under the floor, to which

I fastened the engines by means of extra straps and bolts. Q. What effect did this vibration and shake have on the matter of breakdowns and repairs? A. It had the effect of breaking many parts of the engine and throwing other parts out of adjustment. In one case it broke the frame of the trolley engine. Q. What other parts would break under the vibration? A. The crank shafts, slides, piston rods, wrist pins. Q. Was your work of unloading interrupted by these breakdowns? A. Yes. Q. How often? A. It would depend on the length of the time required to discharge a barge. On a barge of small capacity we might have no breakdowns. On the larger barges, and when we had two or more, with no interval between to make repairs, we would have several delays. Q. How does the performance of the combined trolley and hoist engines which you now have compare with the performance of the separately mounted geared engines as regards breakdowns? A. The breakdowns have been entirely eliminated. Q. Has any delay been caused by breakdowns with the combined type of engine? A. None. Q. How does the repair expense and maintenance cost of the combined type of engine compare with that which you have experienced with the separately mounted engines? A. Up to the present time the repair expense has been practically nothing—75 cents. The cost of maintenance up to the present time is very slight. Q. What was the nature of the repair you refer to as having cost 75 cents? A. Replacing of a wire guard on one drum, which was broken by a loose strand of wire on one of the falls; that was not a working part of the engine. Q. Was this the fault of the engine? A. No. Q. What was the approximate cost per year of the repairs and maintenance in the case of the geared engines, as nearly as you can give it? A. Approximately $150 for repairs and parts made by machine shops, and about $500 a year for engineers' time when not hoisting coal in overhauling and making minor repairs. Q. How much, if anything, would you lose in premiums due to the breakdowns of the separately mounted geared engines and consequent delay in unloading vessels? A. About 30 per cent. of possible earnings. Q. How much would that amount to in dollars for each vessel unloaded? A. In the case of a barge on which we should earn three days' or $60 premium without working overtime, we usually earned two days' or $40 premium."

The superintendent of the Metropolitan Street Railway Company of New York testified:

"Q. What trouble did you experience with the first set of engines of the separately mounted type? A. Worn gears, renewing gears due to worn gears, disalignment of the engine, cracking of bed plate, shearing of holding-down bolts, serious vibration of the structure of the tower, disalignment of the tower, causing rivets and bolts to be sheared off, cracking cement floor which engine was bedded to, being necessary to regrout at different times. Q. What was the performance of the separately mounted engines as regard vibration or shake? A. Causing serious vibration, cracking bed plate, disalignment of engine, shearing bolts and rivets, cracking cement floor which engine was bolted to, causing regrouting. Q. How badly was the tower thrown out of alignment? A. So that the windows could not be raised or lowered. Q. How did the performance of the combined type of direct-acting engines compare with that of the first set of engines as regards the troubles you have just described? A. Practically passed away; in other words, we had no further trouble to speak of, outside of a general overhauling which any engine would demand at a stated time. Q. What did you observe was the physical effects on the men of operating the separately mounted geared engines? A. It was impossible to hold men in that particular line of work for any length of time, for they would report sick and finally would quit. * * * Q. From your experience with the two types of engines, would you be willing to employ the separately mounted geared type for a coal tower, provided the combined direct-acting type were available, and, if so, under what conditions? A. I would not install the separate type of engine, owing to the fact that the new type of engine decreased the cost of maintenance, and also decreased the cost of operation and decreased the vibration. Q. Would it have been practicable to have continued the business of the Metropolitan Street Railway power house with the separately mounted geared type of engines? A. It would not."

A foreman engineer of the New York Edison Company testified:

"If a man operates the geared machine 9 hours he has got as much work as he wants to do that day. A direct-acting machine may be operated 16 hours, and a man isn't as tired as he would be with a geared engine for 9 hours."

The foregoing, together with other evidence that might be quoted, sufficiently shows the difficulties in the old art and how effectually they were overcome by the engine of the patentee. These objections were recognized, but no one succeeded in overcoming them. The limitations of available space and the locations of the engines aloft made the question very different from the mere enlargement of a stationary engine located on a solid foundation to stop vibration. The device of the patentee was ingenious, original, and surprisingly effective. By uniting the two engines as he did the patentee saved space, while at the same time he utilized the combined bulk of both engines to insure the stability of each. This permitted direct coupling, with its resultant lower speed. At the same time the unitary foundation of the two engines served to neutralize the vibration of both engines and to make the resultant vibration not the sum of the aggregated co-operating vibrations of the two engines, but the difference between counteracting, opposing vibrations of the two. In other words in the complainant's device the vibration of one engine served to modify, counteract, and minimize the vibration of the other. This seemingly contradictory fact, namely, that the resultant of the vibration of two running engines when unified on one foundation, is rather the difference between, than the aggregate of, their individual potential of vibration, is established by the proofs. The experiment made by the witness Hains tended to show this also. He had two direct-acting engines mounted separately, and subsequently unified them. Operated at the same speed there was a very marked lessening in vibration as shown by the card tests when the same engines were mounted as a unit compared with their vibration when mounted separately. Where the engines were separately remounted he testified, "The vibration was so great that when I stood upon the platform I was practically unable to hold my footing." When they were unified he says, "I was not inconvenienced at all in holding my footing as I was with the other arrangement." This counteracting is testified to in a homely but convincing way by an engineer foreman as a thing he cannot explain, but nevertheless observed as a fact, as follows:

"Q. You have testified that one 'counteracts the other,' referring to the trolley and hoisting engine in answer to question 35. Please explain what you meant by this. A. I mean when you start your hoisting engine running, it causes vibration in the power; then start your trolley engine running— one counteracts the other and does away with a great deal of vibration in the tower. Q. Why does not the addition of the vibration produced by the operation of the trolley engine increase the vibration which had been started by the operation of the hoisting engine? A. I don't know; she don't act that way."

The court below, in substance, held that Norris' device was a mere aggregation and not a combination, and that in such aggregation each of the elements acted in the same way they did when sep-

arate. Herein, as it seems to us, the court fell into error. The invention of Norris does not lie in the tower, the hoisting appliances, the trolley, booms, or bucket. All of these perform the same functions they did before. His inventive disclosure lies in the engines, the motive power, which operates these extraneous, and from a patent standpoint, irrelevant features. The pertinent question in the issue of whether his device was an aggregation or a combination therefore is whether the two separate, individual engines of the prior art operate to perform the same separate individual function in Norris' device. If they did, if Norris has simply placed them in a different location, if he has simply made a larger type of engines and put them in more convenient relative position, and if in such position each engine continues to do the same thing, fulfill the same function and bring about the same result each did in its former relation, then the court was right in holding as it did that:

"Comparing the operation of a set of direct-acting engines located side by side, or in tandem, I discover no difference nor the accomplishment of any new useful results. It must be conceded that by mounting the small engine upon the larger, some space is economized, but this does not affect the functions of the structures or their effectiveness."

[3] We have already quoted at length the evidence of the marked effectiveness of the new device over the old. In the first place it has made possible very substantially quicker dispatch; it has substituted the hoisting of five buckets a minute for three; it has obviated breakdowns due to vibration; has made possible the use of larger vessels in the coal-carrying trade; and has reduced coal freights from 5 to 10 cents per ton. Nor are these features—great as they are—all that is useful in this device. For apart from all mechanical and operative benefits, the very important capacity it has in lessening the strain and tension of a very trying field of labor not only enhances its value in the regard of this court (Mott Iron Works v. Standard Sanitary Mfg. Co., 159 Fed. 135, 86 C. C. A. 325), but tends to show its highly useful operative character. Indeed, the uncontradicted evidence of the marked difference in labor conditions in the operation of the two devices in itself stamps them as operating in a wholly different way.

A study of the testimony in this case satisfies us that the difference in operating principle between Norris' device and former methods and its increase in motive efficiency consisted: First, in the substitution of direct for geared engines; and, second, in making such substitution possible by coupling the hoist and trolley engines in a unitary structure. That a direct-acting engine could be run at lower speed and with less vibration was a mechanical commonplace well known in the art, and that such direct-acting engines were adapted to both hoisting and trolley service was equally clear. But in the face of such knowledge the art continued its use of geared engines. Its reasons for so doing are manifest. Direct engines had to be heavier than geared ones, and when it came to increasing the already objectionable wear and tear of vibration by placing materially heavier engines in a high tower, the objection was so obvious that no such substitution was made. The art still went on using geared engines.

In the light of accomplishment it would seem a simple solution to substitute direct for geared engines, and to place them in tandem, the trolley within the legs of the hoist engine. But the answer to this is why, if it was so simple, did no one do it, and why, if it was so simple, did the Patent Office dignify such a simple mechanical step with the prima facies of invention involved in the grant of this patent? It is also noticeable that the exhibits of the defendant of alleged pertinent references comprise 25 American and 7 English patents addressed to the hoisting, dredging, and conveying art. This shows that the field was one in which inventive effort was active, but in the coal-hoisting art ineffective. And reflection shows the problem was not then so simple as now appears. In the first place the necessary location of the engines made the problem wholly different from that of merely increasing the size of engines located on the ground. In a way the difference was as marked as between marine and land engines. The change from geared to direct engines meant very substantial heavier weight, which added to the destructive effects of continuous vibration in a high tower. To load a high tower with the heavy additional weight of two direct engines was apparently prohibitive. So also the necessity for added floor space in the tower house presented another obstacle. For it is apparent that while additional floor space can be added to the breadth of the tower house floor, yet there was not the same latitude of expansion in its depth. In that respect the testimony is:

"Q. Is it more important to save space lengthwise the wharf or crosswise the wharf in economizing in space in the tower? A. Crosswise the wharf. Q. Why? A. For the reason that a wharf must be constructed to accommodate the barge, regardless of expense and attendant wharf privileges. The barge, in other words, determines the length usually of the wharf; the width of the wharf is controlled by the tower arrangement. The more narrow we can make our tower, the less we need make the width of our wharf, and consequently the high-priced wharf privileges are economized. Q. When you refer to the narrower you can make your tower you mean the narrower transversely to the wharf? A. Yes; that is it."

In that respect it is justly contended by counsel:

"For example, it will readily be seen that, with a trackway or wharfage 500 feet long, an increase in the width of the tower will not at all affect the pier or wharfage construction or shore privileges required. An increase of but one foot in the length of the tower, however, i. e., transverse the wharf, means an additional 500 square feet of wharfage, or perhaps expensive pier construction. Or, if the privilege of widening the wharf on the waterside cannot be had, it must be extended on the landside with so much added expense for the land and curtailment of a corresponding amount of adjacent storage facilities (Hains, p. 398, Rec. vol. 2), the equivalent perhaps of many thousand tons of coal."

In the face of these seemingly prohibitory limitations the patentee evolved his device which permitted him to do several things: First, he was able to get the added weight which enabled him to change his geared trolley engine into a direct trolley engine without such added weight being objectionable. Second, he was able to get the added weight which enabled him to change his geared hoisting engine into a direct-hoisting engine without such added weight being objectionable. Third,

he made possible the placing of these two heavy direct engines in tandem position, and thus carried his rapid-traveling ropes in direct lines to his sheaves and located all the machinery in the center line of the tower. This was all accomplished by locating the trolley engine within the legs of the hoisting engine and making both engines integral parts of a single base. This novel construction effected novel results. In the first place the direct action of his engines enabled them to run at a lower speed. Secondly, their lower speed caused less vibration, and their heavier structure correspondingly absorbed and minimized such vibration as was caused. Thirdly, the unifying of the engines on a common base gave to each engine the stability both of its own weight and of its fellow. Back of each was the weight of both. And, lastly, because of the union on a common base the vibration of the two engines when both were operated tended to absorb, counteract, or neutralize the vibration originated by the other. The trolley engine no longer operates separately and alone, but by its new conjoint relation to the hoisting engine it availed itself of its weight, and was thus enabled to dispense with its bearing, lower its speed, reduce its vibration, and at the same time use the vibration of its fellow to counteract its own. In a like way the separate hoisting engine of the old art was changed by its joinder to the trolley engine. The action of each modified and was essential to the utilization and operation of the other. To our mind, the interdependent action of the two constituted a marked example of a genuine co-operative union. Added to these operative relations we have striking commercial gains in five buckets being lifted instead of three, and the humane result in labor already referred to. In view of these facts and of other advantages testified to in the proofs, we are constrained to regard the device as novel, useful, and inventive. Indeed, to this case may be applied what was said in this circuit in Standard Co. v. Burdett-Rowntree Co. (D. C.) 196 Fed. 46, affirmed in 197 Fed. 743, 117 C. C. A. 206:

"It must be conceded that in the last analysis the patent does not do much more than move signals from one place to another without changing their function, but in doing this a real contribution has been made to the art, and a contribution, I think, of considerable value. By the grouping and arrangement that are said to be merely aggregation, it seems plain that an intimately related whole has in fact been evolved, in which each part has been made more effective to accomplish the common object, and in which this increased efficiency is due to the new relation of each part to the others. The total result is certainly greatly improved in the several particulars already referred to; and, while it is not a tangible product that has been improved, the new method of operation produces a clearly perceptible advance in the art. Elevators with one-point control arrangement of signals and motors are operated more rapidly, more easily, more safely, and more efficiently, and this greatly improved operation seems to be a new and beneficial result produced by a new combination and arrangement of known elements within the meaning of the language used in Loom Co. v. Higgins, 105 U. S. 580 [26 L. Ed. 1177]."

[4] We have not overlooked the fact that there was no mention in the patent of the lessening of vibration which now appears to be the most striking advantage of the patent. But we do not think the failure to disclose all the merits of a device should now serve to defeat it. Very often subsequent use shows that claimed advantages did not

materialize, and in the same way use sometimes brings to light unsuspected merits in a device. In either case the presence or absence of asserted advantages is of evidential weight in securing the patent. The gist of a disclosure is that it be so full as will enable those versed in the art to thereafter use the device, and where such use, practice, mechanism, formula, etc., are fully disclosed, the requirements of the law are satisfied, without claiming every advantage such device may have. If subsequent use discloses unsuspected additional benefits the patentee is the gainer during the life of the patent, and the public when it expires. It will also be noted that while this patentee only specifically stated two alleged advantages, viz.—"by this arrangement of engine I economize room in the tower and, what is more important, am enabled to place all the levers of the engine mechanism within easy reach of a single operator," he also adds:

"I have found from practice that a duplex engine constructed as above * * * has many advantages over the ordinary construction in which two entirely separated engines are situated at different parts of the tower."

After full consideration we are of opinion the court erred in not holding the patent valid. Its decree will therefore be reversed, and the case remanded, with instructions to enter a decree adjudging its validity and infringement.