## STANDARD TRANSP. CO. v. WOOD TOWING CORPORATION.

### No. 3421.

Circuit Court of Appeals, Fourth Circuit.

April 4, 1933.

R. Arthur Jett, of Norfolk, Va. (J. M. Nugent and Kelsey & Jett, of Norfolk, Va., on the brief), for appellant.

John W. Oast, Jr., of Norfolk, Va., for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

NORTHCOTT, Circuit Judge.

The libel in this case was filed by the Standard Transportation Company, a corporation, against the Wood Towing Corporation, a corporation, in the District Court of the United States for the Eastern District of Virginia, on the 10th day of September, 1929. It was filed for the purpose of recovering damages alleged to have been sustained by the steamship Tiger, owned by libelant, while the said steamship was being placed in the inner or bulkhead berth of Army Base Pier No. 2, at Norfolk, Va., by the tug Nonpareil owned by the respondent.

The Tiger was a steam vessel 428 feet long over all and of about 6,000 gross tonnage. The tug Nonpareil is a steam tug 101 feet long with a gross tonnage of 167 tons and was in charge of a captain holding a second class pilot license which permitted him to have charge of tugs not exceeding 150 tons, gross tonnage.

On the morning of August 20, 1926, the Nonpareil came along side the Tiger at about 6:50 o'clock a. m. and made fast to the Tiger's port bow and the master of the tug went upon the bridge of the Tiger and took charge for the purpose of docking the steamship. In docking, the bow of the steamship struck the concrete bulkhead with such force as to cause damages to the steamship estimated by libelant to amount to $18,000. The hearing was had in January, 1932. Twenty-two witnesses were heard in person and the depositions of three witnesses were filed. The judge below promptly made a complete finding of facts to the effect that the captain of the tug was not to blame for the accident but that it was caused by the failure, by the force in the engine room of the steamship Tiger, to obey the orders of the captain of the tug. A decree was entered dismissing the libel

with costs, from which action this appeal was brought.

The accident happened about 7:28 a. m. on the morning in question. At the time of the collision the weather was clear, and the tide was high water slack. Neither the wind nor the tide affected the movements of the tug or steamship.

The master of the tug took charge of the Tiger at a point between the Army Base and the Standard Oil docks and proceeded with the tug fast to the steamship's port bow, the tug's stem being about 35 to 40 feet aft of the steamship's stem. The steamship's power was being used together with the tug's power. The other officers on the steamship's bridge with the tug master, were the steamship's master, a full branch Virginia state pilot, and the steamship's third officer stationed at the telegraph. There was a quartermaster at the wheel. The master of the steamship informed the master of the tug that the Tiger's backing power was poor.

After the vessels entered the slip, the master of the tug on the ship's bridge, signaled to the ship's engines to stop. This signal was promptly obeyed and the steamship came to practically a dead stop at a point about opposite the middle berth of the dock and about 60 feet distance therefrom, parallel with the side of the pier. When about a ship's length from the bulkhead the tug master ordered the steamship's engines, "slow ahead" and immediately "stop" and then, intending to wait longer for a pile driver that was in the way, to be moved, the tug master gave the orders "slow astern" and put the helm 'hard astarboard and then ordered "half astern" and "full astern" and then "heavy astern" and dropped the port anchor and backed the tug. Immediately after the signal "heavy astern" the steamship rammed with her stem the concrete bulkhead with great force, so as to crush her stem inboard a distance of 15 feet.

There was direct conflict of evidence as to whether the orders "slow astern," "half astern," and "full astern" were obeyed in the engine room of the steamship. The third assistant engineer of the steamship and an oiler, who were the two men in the engine room, testified that the orders were obeyed as given by the tug master, and the chief engineer of the steamship testified that when he reached the engine room shortly after the collision the engine was in a reverse position. Witnesses testified that the current of water moving from the stern of the steamer showed that the engines were not reversed until after the final order of "heavy astern." The captain of the tug testified that the ship continued to gain headway after his orders of "slow astern," "half astern," and "full astern." The evidence of the chief engineer of the steamship as to the position in which he found the engines is in accord with the evidence of other witnesses to the effect that the engines were reversed immediately before the collision but too late to avert it. The judge below held that had the orders of the tug master been obeyed the collision would have been averted.

As to the contention of libelant that the tug master was at fault in not using a spring line, the evidence sustains the finding of fact made by the judge below that there was no opportunity to use such a line.

Expert evidence was offered on behalf of both parties as to the navigation of the steamship by the tug master and it was contended on behalf of libelant that the tug was not properly attached to the steamship but on this point the trial judge found against this contention and we think properly so found.

■■ It has long been held by this court that the finding of the trial judge is entitled to great weight. In The Corapeake, 55 F. (2d) 228, we said: " * * * This court has repeatedly laid down the rule that the finding of a trial judge, who had the opportunity of seeing the witnesses, hearing their story, judging their appearance, manner, and credibility, on a question of fact, is entitled to great weight and will not be set aside unless clearly wrong. Virginia Shipbuilding Corporation et al. v. United States (C. C. A.) 22 F.(2d) 38; Lewis v. Jones (C. C. A.) 27 F.(2d) 72; Chesapeake Lighterage & Towing Co., Inc., v. Baltimore Copper Smelting & Rolling Co. (C. C. A.) 40 F.(2d) 394; Lambert Lumber Co. v. Jones Engineering & Construction Co., Inc., et al. (C. C. A.) 47 F.(2d) 74; Commercial Casualty Ins. Co. v. Williams (C. C. A.) 49 F.(2d) 472."

Here the trial judge heard all but three of the witnesses. We are of the opinion that the findings of fact of the judge, to the effect that the navigation of the steamship was without fault on the part of the tug master are correct.

It was held by the Supreme Court in Stevens v. The White City, 285 U. S. 195, 52 S. Ct. 347, 350, 76 L. Ed. 699, that under such a situation as here existed the owner of the tug owed the owner of the steamship only " * * * the duty to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service. The burden was upon petitioner to show that the loss for which he sought recov-

ery was caused by a breach of that duty." The captain of the steamship was on the bridge with the captain of the tug and throughout the entire occurrence made no complaint as to the handling of the steamship and the tug by the tug master nor was any complaint as to the conduct of the tug master made in any form until the filing of this libel.

" * * * The tug does not have exclusive control over the tow, but only so far as is necessary to enable the tug and those in charge of her to fulfill the engagement. They do not have control such as belongs to common carriers and other bailees. They have no authority over the master or hands of the towed vessel beyond such as is required to govern the movement of the flotilla. In all other respects and for all other purposes the vessel in tow, its cargo and crew, remain under the authority of its master; and, in emergency the duty is upon him to determine what shall be done for the safety of his vessel and her cargo. In all such cases the right of decision belongs to the master of the tow and not to the master of the tug." Stevens v. The White City, supra. See, also, The Ashwaubemie (C. C. A.) 3 F.(2d) 782.

▇ There are other significant circumstances connected with the case which tend strongly to support the judge below in his conclusion. As stated above no complaint was made at the time or for a long time after the collision. No claim or demand was made for the damages and no libel was filed until more than three years after the happening. The courts do not look with favor on delays of this kind. Witnesses may die or become scattered. In this case the third officer of the steamship who was on the bridge could not be found. The court expressed the opinion that efforts to locate him on the part of the libelant were not such as to satisfy the judge that everything possible had been done. Under the circumstances it is to be presumed that his evidence would not have been favorable to libelant. Henderson v. Richardson Co., et al. (C. C. A.) 25 F.(2d) 225, and authorities there cited. The unusual and unexplained delay in bringing this matter to issue was the delay of libelant.

It is strongly contended on behalf of libelant that the fact that the tug master was only licensed for a tug of 150 tons, gross tonnage, placed upon respondent the burden of proving that the failure to observe this regulation could not have contributed to the accident. The Eagle Wing (D. C.) 135 F. 826. In view of the fact that the judge below found that there was no fault on the part of the tug master and that the steamship was properly navigated by him it follows that the failure to observe the regulations could not have contributed to the accident. We are in accord with the opinion expressed by the judge below that the fault lay with the engine room crew of the steamship, and the decree is accordingly affirmed.