## GENERAL ELECTRIC CO. v. BULLDOG ELECTRIC PRODUCTS CO.

### No. 3474.

District Court, S. D. West Virginia, Charleston.

Sept. 16, 1938.

Harrison F. Lyman, of Boston, Mass., A. E. Bobst, of Schenectady, N. Y., and C. E. Hammett, Jr., of Boston, Mass. (Price, Smith & Spilman and Howard R. Klostermeyer, of Charleston, W. Va., on the brief), for plaintiff.

Butzel, Levin & Winston and Daniel G. Cullen, of Detroit, Mich. (Rummel, Blagg & Stone, of Charleston, W. Va., on the brief), for defendant.

McCLINTIC, District Judge.

This is a suit in equity brought by the plaintiff, General Electric Company, to enjoin the infringement of Patent No. 1,967,091 applied for by Leslie A. Kempton and issued on July 17, 1934, to the plaintiff. Plaintiff also seeks an accounting and damages for defendant's alleged infringement.

The defendant, Bulldog Electric Products Company, denies the alleged infringement and has filed a counterclaim in which it asks that the plaintiff be enjoined from infringing Patent No. 1,995,386 issued on March 26, 1935, to Harrison J. L. Frank, who assigned same to the defendant. Defendant also prays recovery of damages on account of the alleged infringement by the plaintiff.

The parties have narrowed the issues on the plaintiff's bill and the defendant's counterclaim by filing statements of the particulars of their respective claims.

The first issue is whether or not the devices manufactured by the defendant (Plaintiff's Exhibits G and H) infringe Claims 3, 4 and 5 of Kempton Patent No. 1,967,091. The plaintiff contends that the defendant's device Exhibit G infringes Claims 3 and 4 of the Kempton patent, and

that defendant's device Exhibit H infringes Claims 3, 4 and 5 of said Kempton patent. The Kempton patent relates to a system of wiring for an electric range, that is, a receptacle for use and used in the wiring of electric ranges. Defendant's devices Exhibits G and H are range receptacles. The receptacles Exhibits G and H are identical except that Exhibit H carries grounding straps which do not appear on Exhibit G.

The defendant contends that it is not infringing the plaintiff's patent because Kempton was not a pioneer inventor and his invention related to the subject of an extremely crowded art; that therefore the claims of his patent should be limited to the particular device manufactured by the plaintiff, and if so limited, the defendant's devices do not infringe the patent; in other words, that the plaintiff's patent has a very narrow range of equivalents. As a corollary of this proposition, defendant says that if its devices Exhibits G and H are held to infringe Claims 3, 4 and 5 of Kempton patent, then Kempton patent is void because its claims are readable on prior patents, notably Hessel No. 1,647,697 (Exhibit D–24).

■ The evidence shows that at the time Kempton's patent was issued there were a number of previous patents (33 such patents were offered by the defendant) covering various elements of the Kempton patent. A careful examination of these patents convinces this court that the invention of Kempton is not disclosed by any of the prior art. In fact, the defendant did not offer such prior art in anticipation of the Kempton patent. It was merely offered for the purpose of limiting the scope of Kempton's claims by showing that the art was already crowded. It is well settled that a combination of old elements, displaying the exercise of skill and genius, which produces a new and useful result, is invention and hence patentable. Black & Decker Mfg. Co. et al. v. Baltimore Truck Tire Service Corporation, 4 Cir., 40 F.2d 910.

■ Defendant offered as Exhibit D–4 a model which it contends illustrates the disclosure of Noble Patent No. 1,881,883, which was offered as Exhibit D–3 to show the state of the prior art. Plaintiff objected to the introduction of the model on the ground that it differed materially from the disclosure of the Noble patent, and in its brief, also, because not set up in the defendant's answer and thus violates Rev.St.

§ 4920, 35 U.S.C.A. § 69. Plaintiff's objections are overruled. Exhibit D–4 has been considered along with the other defendant's exhibits. It certainly shows that the idea of a plug and receptacle in electric wiring was not new with Kempton, while at the same time the patent to Noble does not disclose the Kempton invention as embodied in Plaintiff's Exhibits A and B. Nor does Rev.St. § 4920 prohibit consideration of Exhibit D–4. That exhibit was offered merely as illustrative of a prior art patent, and the patent itself was not offered to show lack of invention by Kempton, but merely a crowded art.

The defendant's position with respect to the effect of the prior art upon the construction of the claims of a patent, consisting merely of an improvement in a crowded art, is sound and supported by ample authority. In the case of Victor Cooler Door Co. v. Jamison Cold Storage Door Co., 4 Cir., 44 F.2d 288, Parker, J., said [page 291]: "The patent in question is not a basic or pioneer patent, but is one for a mere improvement in a crowded art, and as such is not entitled to a liberal construction, but must be practically limited to the means shown by the invention." Demco v. Doughnut Machine Corporation, 4 Cir., 62 F.2d 23; Lord Baltimore Press v. Labombarde, 4 Cir., 197 F. 739; and numerous other cases. However, the evidence in this case shows conclusively that Kempton's invention, while not such as is ordinarily termed "pioneer," was none the less meritorious and substantially advanced the art of wiring electric ranges. The evidence shows that prior to the Kempton patent the general practice of electricians and dealers in wiring electric ranges, that is, in connecting an electric range with the source of electric power, required a separate circuit because a heavier voltage is required for ranges than for ordinary lighting. The range was wired from the source of power to a disconnect switch, and then permanently from such switch to the range. A model of such a disconnect switch was offered in evidence as Plaintiff's Exhibit J. It is unsightly, cumbersome, and no doubt inconvenient. The evidence shows that up until about ten years ago it was the practice to install an electric range as fixed equipment. This necessitated two trips by an electrician in making the installation, and two inspections, one when the switch box was installed, and one when the range was connected. The wiring to the switch had to be done before the range could be

delivered to the buyer in the house. Then, after the range was delivered, an electrician would have to go back and do a further job of wiring from the disconnect switch to the range. At that time flush range receptacles were used; that is, a range receptacle was installed flush with the wall or the baseboard. The flush receptacle was fairly satisfactory where it was specified for new construction, but in installing electric ranges in old houses it required cutting holes through the woodwork, cutting out a space for the receptacle, and usually made an unsatisfactory and unsightly piece of work. If the owner of the range moved, it was necessary to call an electrician to disconnect the range, and to call an electrician to connect the range in the new house to which it was moved. Kempton set about to meet the need created by this condition. Notwithstanding the multitude of prior patents which the defendant says shows a crowded condition of the art, no one prior to Kempton had invented or manufactured a device that, as a practical matter, served the purpose of Kempton's device. As soon as it was marketed in 1930, it was adopted by electricians and approved by fire underwriters. Notwithstanding the Noble, Hessel and other patents, no one up to that time had discovered an inexpensive, neat, convenient and workable system for wiring an electric range to the source of current. Witness Ficklen, division manager of the Appalachian Electric Power Company, engaged in the business of selling electric ranges for ten years, and who is familiar with range receptacles, testified that the Kempton device first came to his attention in 1931, and that he immediately put it into use and has used it ever since. He testified that prior to that time the Appalachian Electric Power Company used a disconnect switch box of the kind shown by Exhibit J, which was clumsy to install, and that it was difficult to connect the range in the original installation and required the services of a skilled electrician to connect and disconnect it, and that he had been looking for something to simplify the installation of electric ranges that would have more convenience and would decrease the cost of installation; and that he regarded the Kempton patent as "a very decided improvement" and "much better than anything we have had before." A fact also shown by the evidence is that the device manufactured under the Kempton patent was immediately accepted by the public. In 1930 the plain-

tiff sold 8,300 such devices; in 1931, 28,300; in 1932, 14,200; in 1933, 11,500; in 1934, 16,400; and in 1935, 12,500 of the original type devices. In addition to these sales, it appears that three companies manufacturing electrical devices took licenses from the plaintiff, namely, Bryant Electric Company, Harvey Hubbell, Inc., and Arrow, Hart & Hedgeman Electric Company. These licensees have manufactured and sold approximately 120,000 additional receptacles under the Kempton patent. It has been held that commercial success is very persuasive evidence that the invention offers a substantial contribution to the art. Wahl Clipper Corporation v. Andis Clipper Co., 7 Cir., 66 F.2d 162; Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corporation, supra.

The extent of the effect of Kempton's contribution to the art of wiring electric ranges is not measured by the mere wording of the many prior patents which were offered in evidence, but the true test is its actual effect upon the art to which it belongs. In Naylor v. Alsop Process Co., 168 F. 911, the Circuit Court of Appeals for the Eighth Circuit said [page 917]: "The merit of a patent is to be determined, not by its standing in dialectics, but by its actual effects in the art to which it belongs."

Thus, while the defendant's proposition of law is sound, it does not apply to the facts in this case. The rule applicable here is that stated by the Circuit Court of Appeals for the Fourth Circuit in the case of Hoeltke v. C. M. Kemp Mfg. Co., 80 F. 2d 912, at page 921, where the court said: "Whether complainant's patent be treated as a pioneer or basic patent or not, he unquestionably made a valuable contribution to the art; and it is well settled that in such case his patent is entitled to liberal treatment." Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corporation, supra; Eibel Process Co. v. Minnesota, etc., Co., 261 U.S. 45, 43 S.Ct. 322, 67 L. Ed. 523.

Notwithstanding that this court believes from the evidence that the Kempton patent substantially advanced the art and that the plaintiff's patent is entitled to liberal treatment, the evidence shows infringement by the defendant's devices, Exhibits G and H, even when the scope of the plaintiff's claims is restricted.

It has been held by the Supreme Court of the United States that: "There is a substantial identity, constituting infringement,

where a device is a copy of the thing described by the patentee, 'either without variation, or with such variations as are consistent with its being in substance the same thing.' * * * And generally speaking, one device is an infringement of another 'if it performs substantially the same function in substantially the same way to obtain the same result.'" Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 50 S.Ct. 9, 12, 74 L.Ed. 147.

█ Do the defendant's devices, Exhibits G and H, perform substantially the same function in substantially the same way to obtain the same result as the Kempton patent? The defendant's chief witness, Mr. Frank, who had never installed an electric range in person, testified that the defendant company was asked to design a range receptacle, and at that time the defendant had before it the General Electric device in the form of Plaintiff's Exhibits A and B. He testified that the defendant endeavored to get something that performed the same function. This is highly significant. If the prior art offered by defendant taught the same thing as Kempton's patent in the way of wiring range receptacles, why did the defendant attempt to find a device that performed the same functions as the plaintiff's devices. In view of the mass of prior art submitted by the defendant and the defendant's claims that the plaintiff's invention is very limited in its scope, one would think the defendant, instead of using the plaintiff's device as its model, would have used those examples of the prior art which it felt taught the same principle. The slight changes in the defendant's devices are immaterial changes in form only. If the defendant's devices were true copies in the identical form of the plaintiff's devices, there would be an obvious case of infringement. But as stated in Hoeltke v. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 921: "It is only ingenious diversities of form and proportion, presenting the appearance of something unlike the thing patented, which give rise to questions; and the property of inventors would be valueless, if it were enough for the defendant to say, your improvement consisted in a change of form; you describe and claim but one form; I have not taken that, and so have not infringed."

In Kurtz v. Belle Hat Lining Co., 280 F. 277, the Circuit Court of Appeals for the Second Circuit said [page 281]: "The imitation of a thing patented by a defendant, who denies invention, has often been regarded, perhaps especially in this circuit, as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think."

█ The defendant's witness Frank further testified that the general elements that are shown in the Kempton patent are present in the General Electric devices and also in the Bulldog devices. He later qualified this by saying that there are several parts of the two devices, later referred to, different in the Bulldog devices from those found in the plaintiff's devices. However, the defendant by this testimony virtually admits that its devices adopt the gist or material elements of the Kempton patent. Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corporation, supra. As stated in the case of Frick Co. v. Lindsay, 4 Cir., 27 F.2d 59, 62: "The court will look through the disguises, however ingenious, to see whether the inventive idea of the original patentee has been appropriated, and whether the defendants' device contains the material features of the patent in suit, and will declare infringement even when those features have been supplemented and modified to such an extent that the defendant may be entitled to a patent for the improvement."

█ Notwithstanding the defendant secured a patent and there are some slight differences in the form of its device, it is well settled that patentable difference does not of itself tend to negative infringement.

█ The claims of the Kempton patent clearly read upon the defendant's devices. The defendant's device Exhibit G is (1) an electric receptacle, (2) comprising a base of insulating material, (3) having an open face, (4) contact clips secured in recesses in said base, (5) a flat metallic anchor plate secured to the rear of said base, and (6) having a portion extending forwardly at right angles to the base to form an end wall for the receptacle, (7) an opening in the portion of said anchor plate extending forwardly through which conductors may pass and may be secured to said anchor plate, (8) means to connect conductors to said contact clips, and (9) a cover of insulating material secured to said base and (10) having openings in line with said contact clips—all the essentials of Claim 3 of the Kempton patent. Claims 4 and 5 likewise read on the defendant's appropriate devices. This court understands the rule to be that the mere fact that the

claims of the patent read upon the defendant's infringing device is not conclusive evidence of infringement, but the fact is certainly entitled to some weight. As pointed out above, the true test of infringement is to determine whether the defendant's device is substantially the same as the plaintiff's, what function it performs, and whether it performs substantially the same function in substantially the same way to obtain substantially the same result. Frick Co. v. Lindsay, supra; Sanitary Refrigerator Co. v. Winters, supra. The defendant points out certain differences between its device and that of the plaintiff. It says that the plaintiff's devices are "of the split half" type, while the defendant's devices are of the box or receptacle type. An inspection of the exhibits convinces this court that this is a distinction without a difference. It is necessary that the working parts or the parts upon which the wires are attached and contact clips are mounted, should be encased for purposes of safety and cleanliness. It matters little whether the enclosure is formed by a bottom and top of approximately equal dimensions or whether the top comprises the whole cover of the device. Such is but a slight change in form and not a change in substance.

The defendant went to some length in its evidence and in its brief to distinguish the "base" of its device from the base of the plaintiff's devices. This court is not impressed with the attempted distinctions and refinements of the word "base." The fact remains that the principal working parts of each device, those parts without which it would be useless, are the terminals and the contact clips. Those are the more important parts of each device. The fact that the defendant's terminals and contact clips are upon an insulated block which is removable from the metal plate to which they are attached, is again but a slight difference in form without a difference in essentials. Furthermore, the defendant has used the word "base" in so many senses in this case that it is somewhat difficult to settle upon which meaning it would have the court adopt. In its brief defendant says that the base of its device is the metallic bracket to which the insulating block is attached. In its statement of particulars the defendant says "the cover is not secured to the base, even though it is secured to the anchor plate upon which is mounted the base," and "the base is mounted upon the anchor plate," and "in the defendant's structure the anchor plate is secured to the

back of the base." Witness Frank, at page 256 of the transcript of testimony, referred to the insulating block as the base. He said, "The Bulldog device gives a little more room for wiring and permits the base to be removed in wiring if desired." The "base" of defendant's devices, Exhibits G and H, is the removable insulating block. The base has an open face, in that when the cover is removed, the parts are exposed. It contains contact clips, secured in recesses in the base, all as set forth in Kempton Claims 3 and 4.

The defendant says that its device is different in that it has a knockout in the back, whereas the plaintiff's original device only had a knockout at the bottom. From the examples of prior art offered, it appears that there was nothing new in the idea of back knockouts, and notwithstanding this alleged difference, it is apparent that the plaintiff could have used a back knockout through the back of its anchor plate and insulating base. In fact, its later device is so constructed. Kempton's claims are not limited to a knockout in the bottom of the anchor plate.

Defendant says that its device is different principally because the body of insulation or insulating block is of less area than the back part of the metal bracket. This difference was required by the limitation of the Frank patent when the Kempton patent was cited in the Patent Office as a reference. Kempton's claims are not limited in this respect.

The court can see no substantial difference between Exhibits A and B on the one hand and Exhibits G and H on the other. Both are surface range receptacles adapted to be mounted on a wall or baseboard. Both are connected to the range by the insertion of an electric plug on the end of a cord. Both are so constructed that when the cover is removed, the working parts are available to the electrician. Both are three-wire devices. Both are provided with recesses to insulate the contact clips from each other. Both have a metal plate attached to the insulation block, the function of which is to support the bottom of the receptacle and the cable which will be inserted through it. Both Exhibits B and H are supplied with grounding strips which cooperate with the contacts in such a way as to make a complete grounding connection from the range to the ground without using any of the internal wires in the system. The fact that one screw holds the

Bulldog cover in place and three screws are required in the General Electric cover, does not make them substantially different. In the plaintiff's device the base part consists of an insulating body to the back of which an anchor metal plate is attached, while in the defendant's device the base is an insulating block attached to a metal bracket. The bottom of the defendant's receptacle consists of a metal plate and the insulating base is screwed to that plate.

Both devices are used for wiring electric ranges. The defendant's devices perform the function of wiring an electric range in substantially the same manner as the plaintiff's devices and accomplish the same result as plaintiff's devices, and no other.

The defendant relies principally upon the case of Moslank v. Kulage, 8 Cir., 55 F.2d 835. In that case the court pointed out that there were distinct differences in the construction of the two devices, and, in view of those differences, indulged a presumption in favor of the Kulage patent because of the fact that the Weingartner patent was co-pending in the Patent Office with the Kulage application. The court also said that the presumption was strengthened by the fact that Moslank had practically ceased to manufacture his weather-stripping device in accordance with the claims of the Weingartner patent, and had adopted a device which corresponded in terms to the reading of the Kulage claims.

There are no distinct structural differences between Exhibits A and B and Exhibits G and H in this case. Structurally, they are substantially the same. Nor does it appear from the evidence that the plaintiff has ceased to manufacture its device in accordance with the claims of its patent. In 1935 it redesigned its receptacle to utilize an improved insulating material, but the redesigned device, Exhibits C and D, conforms to the claims of the Kempton patent. The effect of the co-pendency of the applications in the Patent Office is only, as defendant urges, to fortify a conclusion of non-infringement reached by the court upon other grounds. The defendant's authority is not controlling on the facts here involved.

As to the defendant's counterclaim, the plaintiff manufactured the devices shown as Plaintiff's Exhibits A and B for several years prior to the issuance of the patent to Frank, and no question is raised by the defendant as to the infringement of its patent by the devices shown as Plaintiff's Exhibits A and B. However, the plaintiff redesigned its receptacle and manufactured a device in the form of Plaintiff's Exhibits C and D. Exhibits A and B were made with a cold-molded insulating material. This material is soft and wears out rapidly. Between the years 1930 and 1934 there was a substantial improvement in the art of using hot-molded phenolic resins as insulating material. The newer material was cheaper and more attractive, and the plaintiff redesigned its receptacles, using the new phenolic resin as an insulating material. The defendant claims that the new devices of the plaintiff, Exhibits C and D, infringe Claims 1, 2, 4, 5, 6 and 7 of the Frank patent. The new plaintiff's device, Exhibits C and D, contains a back knockout through the anchor plate and through the insulating material. As has heretofore been pointed out, there was nothing new in the Frank patent in this respect. Hence the use of this idea by the plaintiff in its later devices constituted no infringement of that feature of the Frank patent. Nor was there anything new in the Frank patent in the use of anchor clips to hold the cable in place, so that the adoption of this idea in the plaintiff's later device did not constitute infringement of the defendant's patent. The patentable difference between the claims of the Frank patent and the plaintiff's later devices, Exhibits C and D, is that the Frank patent calls for a metal bracket of substantially larger area than the insulating block attached to it, whereas the plaintiff's devices, Exhibits C and D, comprise a metal plate of substantially smaller area than the insulating block to which it is attached. The Frank patent being limited in its claims to a contact block or insulation of less area than the back which supports such block, it seems clear that, the plaintiff's devices, Exhibits C and D, having a larger area of insulating material supporting the contacts than the metal anchor plate, there is no infringement. The principle announced in Victor Cooler Door Co. v. Jamison Cold Storage Door Co., supra, applies to the defendant's patent. When the Kempton patent was cited as a reference in the Patent Office, the Examiner rejected Claims 1 to 4 of the Frank patent as not patentable over Kempton. The Examiner said: "Claims 1 through 4 are rejected as not patentable over Kempton cited. The structure of the reference is the same as that set

out in the claims in essentials. The claims differ from the reference in the addition of the knockouts. It is not considered invention to provide a knockout for the aperture of the reference, in view of the universal use of knockouts in all manner of electrical conduit fittings."

Frank then amended his Claims 1 to 4 by limiting them to the specific formation of his receptacle, wherein the insulating body is of less area than the metal plate back.

This court is of opinion that the defendant's device Exhibit G infringes Claims 3 and 4 of Kempton Patent No. 1,967,091, and that defendant's device Exhibit H infringes Claims 3, 4 and 5 of Kempton Patent No. 1,967,091; and that plaintiff's devices Exhibits C and D do not infringe any of Claims 1, 2, 4, 5, 6 and 7 of Frank Patent No. 1,995,386.

It is unnecessary to pass upon the validity of the Frank patent in reaching these conclusions.

An order may be entered perpetually enjoining the defendant from manufacturing and selling the devices shown as Plaintiff's Exhibits G and H, and an order of reference for an accounting of the damages sustained by the plaintiff on account of defendant's infringement of the Kempton patent. Defendant's counterclaim will be dismissed.